In re JOINT EASTERN AND SOUTH-
ERN DISTRICTS ASBESTOS
LITIGATION.

John J. LOPER and Thelma M.
Loper, Plaintiffs,

v.

EAGLE–PICHER INDUSTRIES, INC.,
et al., Defendants.

Rita LIEBSON, individually and as the
Executrix of the Estate of Barnet
Liebson, Plaintiffs,

v.

RAYMARK INDUSTRIES, INC., et
al., Defendants.

Harold SCHAEFER, and Francis
Schaefer, his wife, Plaintiffs,

v.

The CELOTEX CORPORATION, et
al., Defendants.

Nos. CV–87–1383, CV–87–1384
and CV–87–2273.

United States District Court,
E. and S.D. New York.

Oct. 11, 1990.

Greitzer & Locks, Philadelphia, Pa., by
Gene Locks.

Henderson & Goldberg, Pittsburgh, Pa.,
by Thomas Henderson.

Perry Weitz, New York City, by Donald
I. Marlin.

Paul, Reich & Myers, Philadelphia, Pa.,
by Robert E. Paul.

Cahill, Gordon & Reindel, New York
City, by Allen S. Joslyn.

Wood, Williams, Rafalsky & Harris, New
York City, by Earl L. Scott.

Gordon & Silber, New York City, by
David M. Dince.

Christy & Veiner, New York City, by
Franklin B. Velie and Kenneth Tabor.

Weil, Gotshal & Manges, New York City,
by Arvin Maskin, Barbara Taylor, Jacque-
line Prescott, Jennifer Darger.

## AMENDED PRELIMINARY MEMORAN-DUM AND ORDER APPOINTING COUNSEL FOR PROPOSED CLASS MEMBERS AND SPECIAL SETTLE-MENT MASTER

WEINSTEIN, District Judge.

Eagle–Picher Industries, Inc., ("Eagle–
Picher") is a defendant in each of the
above-captioned cases and many others. It
has moved for certification of a class pur-
suant to Rule 23(b)(1)(B) of the Federal
Rules of Civil Procedure on behalf of all
persons who: (1) have been exposed to
asbestos or asbestos-containing materials;
(2) claim to have developed or will in the
future claim to have developed an asbestos-
related illness; and (3) have asserted or
will assert such claims against Eagle–Pich-
er. Determination of whether separate ad-
judications would substantially impede the
ability of the proposed class members to
protect their interests is required. Accord-
ingly, this court appointed the Honorable
Marvin E. Frankel as Special Master to
hold hearings and report on the following
issues:

(1) Are the financial assets of Eagle–Picher so limited that payment of asbestos-related personal injury and wrongful death claims, cross-claims, and third-party claims brought against Eagle–Picher are in jeopardy?

(2) Will the claims of earlier litigants paid on an individual basis exhaust Eagle–Picher's available and projected assets, precluding payments to some claimants?

Special Master Bertram Harnett was appointed to review the status of Eagle–Picher's insurance coverage available to pay asbestos-related claims. His report was submitted to Special Master Frankel and the court.

On September 7, 1990, Special Master Frankel reported. (A copy of the report is attached as an appendix). He concluded that Eagle–Picher's assets "are and will be so limited as to create a substantial risk that payments for present and prospective [asbestos personal injury and wrongful death claims] will be in jeopardy" and that there is a "substantial probability" that the award of damages to earlier litigants will exhaust Eagle–Picher's available and projected assets. Special Master Frankel determined that although Eagle–Picher is not now insolvent, it is likely that it will become insolvent unless changes are made in the method of resolving asbestos-related claims.

The present memorandum and order is based upon the entire record, including the transcripts of hearings, documents and the Report of Special Master Frankel; the report on insurance of Special Master Harnett; other evidence subsequently submitted to the court, briefs and supplementary papers; and a hearing before the court. The Reports of Special Masters Frankel and Harnett are presently under consideration, but the issue of their acceptance by the court is not yet resolved.

In view of the Special Masters' findings and the record to date it is necessary and in the best interest of the proposed class to expedite resolution of this matter to prevent further financial deterioration of Eagle–Picher and thus secure prompt and equitable payments to eligible present and future claimants. Every effort should be made to agree quickly and consensually on the claims of the proposed class members against Eagle–Picher.

Settlement of this action will save enormous costs and time. It will assure the most expeditious satisfaction of the claims of the individual plaintiffs.

A number of talented members of the very able plaintiffs' bar have on their own initiative and without any court action undertaken the burden of beginning negotiations with Eagle–Picher on behalf of the entire class. There are undoubtedly other distinguished members of the plaintiffs' bar willing to commence or carry forward such negotiations even though some of them may oppose certification of the class. These negotiations have to date not resulted in sufficient promise of imminent success given the serious dangers of delay to the prospective class members' interests revealed by the reports of Special Masters Frankel and Harnett.

██ In view of the exigencies reported by Special Masters Frankel and Harnett, the court has power to act prior to addressing the merits of the class certification motion; it may appoint counsel to represent the proposed class. *See In re Agent Orange Product Liability Litigation,* 818 F.2d 179, 187 (2d Cir.1987) (selection of lead counsel for plaintiff class is matter of discretion for district court); *Cullen v. New York State Civil Service Comm'n,* 566 F.2d 846, 848–49 (2nd Cir.1977) (same). The court may request the parties to engage in settlement negotiations before certification. *See County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1422, 1424–25 (E.D.N.Y.1989), *aff'd on this ground,* 907 F.2d 1295 (2d Cir.1990) (it is appropriate for the parties to a class action suit to negotiate a proposed settlement of the action prior to certification of the class); *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982).

Prompt designation of capable counsel now who are able to proceed forcefully and promptly to help protect the prospective class, with the possibility of additional counsel from the plaintiffs' bar to be appointed subsequently to serve as a committee, will expedite this litigation and help

ensure protection of the putative class. The outcome of these negotiations will be helpful in deciding the issue of certification of the class and possible subclasses.

Peter G. Angelos, Esq. and David I. Shapiro, Esq. are appointed to serve as counsel for the proposed class. Mr. Angelos, of the law firm of Peter G. Angelos in Baltimore, Maryland, is a distinguished attorney who represents over 10,000 plaintiffs in asbestos personal injury cases in various jurisdictions in the United States. Mr. Shapiro, of the firm of Dickstein, Shapiro & Morin, in Washington, D.C., is a distinguished attorney who has had extensive experience in the representation of plaintiffs in large class actions, in negotiating class action settlements, and in serving as a representative of the court in complex bankruptcy and other matters. Mr. Angelos will serve as counsel for those members of the proposed plaintiff class with an existing claim against Eagle–Picher. Mr. Shapiro will serve as the representative of the "future claimants"—*i.e.* those class members who may file a claim against Eagle–Picher in the future. *See, e.g., Kane v. Johns–Manville Corp.*, 843 F.2d 636, 639 (2d Cir.1988) (appointment of "legal guardian" for future claimants is proper).

All assets, equity, good will and economic expectations of the corporation will need to be considered in the negotiations. So, too, will methods of paying the seriously affected claimants and of postponing the claims of those with less disabling symptoms. The court's has not decided these and other issues. Some preliminary and tentative guidance to the parties is, however, warranted.

Counsel for the proposed class members will represent the interests of the putative plaintiff class in negotiations with Eagle–Picher to determine the proper allocation of Eagle–Picher's assets for the payment of asbestos-related claims and to determine an equitable method of distributing such assets to class members. It is essential that any available assets be shared equitably among those in need with no attorneys or groups of claimants receiving favored treatment based upon their position. Transaction costs—including attorney fees—for both the corporation and claimants must be kept to an absolute minimum by sensibly structuring the payment plan.

There is an obligation to those injured. There is also an obligation to those with present and future employment and property interests in the defendant as a viable economic entity. The parties may properly consider the costs associated with dismantling our present and future economic structure to pay for prior mistakes—often made by persons long departed from the responsible corporations. *See* 2 American Law Institute Final Report Preliminary Draft No. 3, Compensation and Liability for Product and Process Injuries 415 (1990). Some form of damage priorities or damage scheduling may be required to protect the equitable and legal interests of all those who may be affected. *Id.* at 445–49.

The negotiators should bear in mind that the class action process is not designed to push the defendant corporation into bankruptcy or to make it impossible to conduct its business. The issue of bankruptcy is not now before the court.

To protect the interest of the proposed class, the court reserves the right to evaluate at any time the adequacy of the representation of counsel for the proposed class and to replace or add counsel for the proposed class as may be necessary or appropriate. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1419 (E.D.N.Y.1989), *aff'd on this ground,* 907 F.2d 1295 (2d Cir.1990).

In order to facilitate discussions between the parties, Kenneth R. Feinberg, Esq., is appointed as Special Settlement Master. Mr. Feinberg is directed to coordinate the settlement discussions, provide an expedited schedule for such negotiations and submit oral and written reports to the court on the progress of the negotiations. Settlement discussions should begin immediately.

Eagle–Picher is directed to cooperate with counsel for the proposed class and the Special Settlement Master. It shall provide counsel for the proposed class and the Special Settlement Master with all information and documents necessary to expedite settlement.

With the approval of the court, the Special Settlement Master and the parties may obtain banking, accounting, and other expertise that may be necessary to assist in the settlement discussions. The fees for any such consultants or experts shall be paid by Eagle–Picher, subject to reimbursement from any settlement fund ultimately created.

The fees and expenses of the counsel for the plaintiff class and the Special Settlement Master shall be paid from the settlement fund in the manner approved in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2nd Cir.1990).

So ordered.

## APPENDIX

## SPECIAL MASTER'S REPORT

TO THE HONORABLE JACK B. WEINSTEIN:

Eagle–Picher Industries, Inc., a defendant in the above-captioned cases and others, has moved for certification of a plaintiff class pursuant to Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. The gist of that Rule so far as pertinent here is its provision that a class may be appropriate when separate actions by members of the class "would create a risk of ... adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests...." Following preliminary argument on the motion, the Honorable Jack B. Weinstein determined that it would be necessary to make essential findings as to whether separate adjudications would in fact "as a practical matter ... substantially impair or impede" nonparty class members in protecting their interests. Thereupon, by an order dated August 13, 1990, Judge Weinstein appointed the undersigned as special master to report "on the following matters and any related issues:

"(1) Whether the financial assets of Eagle–Picher Industries, Inc. are so limited that there exists substantial risk that payment for the present and prospective asbestos-related personal injury and wrongful death claims, and cross-claims and third-party claims, brought against the company will be placed in jeopardy.

"(2) Whether 'there is a substantial probability—that is less than a preponderance but more than a mere possibility—that if damages are awarded, the claims of earlier litigants would exhaust' the defendant's available and projected assets, including any pertinent insurance proceeds. *In re 'Agent Orange' Product Liability Litigation*, 100 F.R.D. 718, 726 (E.D.N.Y.1983), *mandamus denied sub nom. In re Diamond Shamrock Chemical Co.*, 725 F.2d 858 (2d Cir.), *cert. denied*, 465 U.S. 1067 [104 S.Ct. 1417, 79 L.Ed.2d 743] (1984)."

The order further provided that the special master "is not limited to the criteria set forth in these two issues if he believes alternative formulations warrant consideration."

This is the report called for by Judge Weinstein's order.

### I. *Procedure*

The Court's order of August 13 directed Eagle–Picher to give "immediate notice" of an initial hearing to be held by the special master on the morning of August 15, 1990. Eagle–Picher complied by giving notice on August 13—by telecopy and telephone—to over 1,000 law firms with pending claims against Eagle–Picher and to 25 present and former co-defendants. In addition, the notice was published in 26 newspapers ranging from New York to Honolulu, but the earliest publication dates available for these were, variously, August 15, 16 and 17.

The initial hearing, as ordered, was convened at 9:00 a.m. on August 15, 1990. The purpose and result of the hearing were to outline the procedure and the schedule under which the work of counsel and the special master would be carried forward. A program of speedy discovery was set, with Eagle–Picher to produce requested documents between August 16 and August 20. Witnesses were to be designated by August 22, 1990. It was agreed, for the sake of expedition, that "direct testimony" would be supplied in the form of affidavits, with the affiants to appear in person for

cross-examination. Eagle–Picher was to serve and file on August 23 a memorandum, with supporting affidavits and exhibits, supporting its motion for certification. Written responses for plaintiffs were due by 5:00 p.m. on August 30 and any reply by 5:00 p.m. on September 4, 1990. The hearing of witnesses was scheduled for as many as necessary of the six days August 27–30 and September 1 and 2. It was resolved that the special master's report would be delivered to Judge Weinstein by 5:00 p.m. on September 7, 1990. The timetable was reported in a "Schedule of Proceedings" mailed by Eagle–Picher to approximately 2,000 lawyers for plaintiffs and 40 to 50 lawyers for defendants.

With minor modifications, the schedule was followed. Counsel went forward with maximum speed and minimum disputation over procedural matters.[1] Defendant produced some 5,600 pages of discovery materials. Five witnesses were heard on August 27–30—Eagle Picher's board chairman and CEO, two of its senior vice presidents, the head of its Asbestos Claims Unit, and the engagement partner of its auditing firm. Plaintiffs, having considered calling an investment banker, ultimately called no witnesses. Counsel met finally with the special master on September 6 for oral argument and on September 7 to critique a draft of this report.

## II. *Positions of the Parties*

The movant urges of course that the evidence will support a determination that there is a "substantial risk of . . . adjudications with respect to individual members of the class which would as a practical matter . . . substantially impair or impede the ability of class members or others to protect their interests." The divergent positions of plaintiffs' counsel are more complicated.

All of plaintiffs' counsel argue that Eagle–Picher, having the burden of proof, has failed to carry its burden and that the motion should simply be denied on this stated ground. Two of plaintiffs' counsel, however (Messrs. Levy and Locks), go on to argue that the evidence shows Eagle–Picher to be "likely insolvent." While that condition, as these lawyers show, would surely support the finding of the "risk" required by Rule 23(b)(1)(B), they do not urge that ultimate finding but merely stop with their alternative position urging the special master to "find by clear and convincing proof that Eagle–Picher Industries is 'likely insolvent'." If not perfectly logical, these several positions are understandable and have been presented cogently.

As against the District Court's direction to inquire after "a substantial probability—that is less than a preponderance but more than a mere possibility—" that early claimants will exhaust the defendant's assets, including insurance, the plaintiffs argue that "something far higher than a 'mere preponderance' should be the standard." Levy–Locks Br. 4. They propose the test of "clear and convincing evidence" of "likely insolvency," noting along the way the Ninth Circuit's statements indicating that a 23(b)(1)(B) class is allowable only if separate actions "inescapably will alter the substance of the rights of others. . . ." *Id.* at 4, 9, citing, *inter alia*, for the evidentiary standard, *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 467 (9th Cir.1973), and, for the "likely insolvency" test, *In re Northern District of California Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847, 852 (9th Cir.1982), and *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1418 (E.D.N.Y.1989) (Weinstein, J.).

The diversity of tests and standards have been duly considered. In a case closer than this one, the measurement of *the*

---

1. Arvin Maskin, Jacqueline Prescott, and Barbara Taylor, with the New York firm of Weil, Gotshal & Manges, led the team supporting the motion. Franklin B. Velie and Wayne C. Matus, with the firm of Christy & Viener, and Anne Cohen of Debevoise & Plimpton, were "ad hoc liaison counsel" for other defendants. They were joined along the way by Jennifer W. Darger of Anderson Kill Olick & Oshinsky. On August 27, 1990, the special master appointed

Gene Locks of Greitzer & Locks, Stanley J. Levy of Levy, Phillips & Konigsberg and Thomas W. Henderson of Henderson & Goldberg, P.C. to act as a steering committee for plaintiffs. Donald I. Marlin of Perry Weitz, P.C., was added to this group, participated in the hearings, and submitted a separate plaintiffs' brief. None of the other plaintiffs' counsel who had received notice of the proceedings appeared or sought leave to participate.

*probability of a likelihood or of a risk* could prompt elegant subtleties. Here, as things turn out, the evidence seems clear and convincing that there exists the "risk" the court defined in both of its stated issues and the threat of insolvency in a future that is not remote unless the present mass of claims against Eagle–Picher can somehow be managed at costs lower than those attending a nationwide multiplicity of cases, courts and redundant transaction costs. It results that—on either the test of "clear and convincing evidence" or the seemingly less stringent test mandated by Judge Weinstein—defendant has borne its burden of proof.

A word, finally, about issues not reached. Both in oral exchanges and in the briefs, counsel for plaintiffs touched upon a variety of interesting questions under Rule 23, under the Anti–Injunction Act, and even under the Constitution. It suffices to say, as plaintiffs tended to recognize in the end, that these matters are not encompassed by the reference to this special master.

### III. *Findings of Fact*

The findings recommended for the Court's approval lead ultimately to the conclusion that there is the kind of "substantial risk" constituting a requirement for the creation of a class under Rule 23(b)(1)(B). Stated more particularly in the factual Conclusions of this report, that ultimate determination rests upon intermediate findings reported as follows:

*Eagle–Picher*

Eagle–Picher, an Ohio corporation, manufactures a variety of products for sale to industrial customers. It is publicly owned, with common stock traded on the New York Stock Exchange; the stock currently trades for approximately $3.50 per share down from a high of $53 in the second quarter of 1987.[2] Incorporated in 1867, Eagle–Picher evolved from a principally lead and zinc mining and processing company to a diversified enterprise consisting of three industrial segments: industrial, machinery and automotive. Diversification, which began in the 1950s, as well as an emphasis on research and development, led to the manufacture of products with general industrial, aerospace, defense, automotive and nuclear applications.

As of its fiscal year ending November 30, 1989, Eagle–Picher operated 50 plants located in 18 states and 5 foreign countries and employed approximately 8,200 persons (including 6,200 hourly employees). For that fiscal year it had revenues totalling $729.9 million and an operating income of $40.1 million.

*Asbestos Claims against Eagle–Picher*

Lawsuits alleging personal injury from exposure to asbestos-containing thermal insulation products commenced against Eagle–Picher in 1966. From 1966 to 1979 it was named as a defendant in 1,300 asbestos cases. Thereafter, the number of new claims increased dramatically; over 128,800 claims have now been filed. Of these, 64,400 have been closed, leaving approximately 64,400 claims pending in both state and federal courts nationwide.

Beyond the sheer volume of current claims, the rate at which new ones are being filed indicates that the number of new claims is not likely to decline in the foreseeable future. It is anticipated that, as in each of the three previous years, well in excess of 20,000 new claims will be filed in 1990.

On two occasions management projected in some detail for defendant's board the total cost of its asbestos liability. In November 1985, it estimated this total liability at $400 million, to be funded in part by $65 million of then existing insurance and $150 million of newly purchased insurance; the balance would be an unfunded reserve of $185 million on Eagle–Picher's balance sheet. The assumptions upon which the estimate was based soon proved to be inaccurate, and the company reestimated its asbestos liability in November 1988. At that time, Eagle–Picher forecasted a future liability of $612.7 million, to be funded from the sale of operations, insurance proceeds and cash generated from operations. The premises upon which the 1988 estimate

---

**2.** The company paid 194 consecutive quarterly dividends until dividend payments were suspended in November 1988.

was based are proving suspect; the number of new claims is not declining, legal expenses are higher than expected and anticipated settlements have not taken place at the predicted rate. In addition, revenues from operations and the three divestitures did not meet the 1988 projections. At this time Eagle–Picher's options appear limited; aggressive settlement of claims and aggressive litigation both require cash flow beyond current expectations.

The forecasts are at the heart of the matter at hand. The purpose of this proceeding is after all a forecast. We turn, accordingly, to a more detailed account of defendant's projections, tested by available experience, to account for the conclusions herein.

*Forecasts and Prospects*

As noted earlier, defendant prepared as of November 2, 1988 a new "Summary of Asbestos Liability" (P.Ex. 3). This projected a total liability of $612.7 million, comprised of $252.7 of current claims and $341.1 for future claims. Despite the surface precision of the numbers, down to mere tenths of millions, the 1988 forecast too has been drawn into question, both by the company and by plaintiffs. The major premises of November 1988, as reported by Senior Vice President and Chief Financial Officer David N. Hall (Affidavit of August 23, 1990, ¶ 11) were that:

> (1) the rate at which new claims would be filed would decline; (2) because cases would be settled early and in large numbers, legal expenses per settled claim would average $1,000; (3) "high value" claims, *i.e.*, those with evidence of actual health impairment as a likely result of exposure to an Eagle–Picher product, could be settled at significant discounts if settled early and for cash; and (4) the mass filings of plant workers would be settled in bulk at very low prices and with low legal expenses.

**3.** In each of the years 1987 through 1989 new claims exceeded 20,000. With 14,719 new claims as of July 31, 1990, the rate is being maintained.

**4.** The insistence of plaintiffs that we should have heard an epidemiologist—and that the absence of such a witness results in defendant's failure to sustain its burden of proof—is not persuasive. If there were additional medical

The rate of new filings has not declined. Legal expenses have exceeded the forecast by more than a third. And, on the asset side, cash receipts have fallen below the estimates. The result is a picture, as defendant acknowledges and plaintiffs do not seriously question, that is fraught with risks going to the company's very survival, let alone its ability to meet its asbestos liabilities.

### (1) The rate of new filings has not declined and may well increase

There is no way to predict with confidence either the rate of future claims, their merits and the eventual cost to defendant of settling or resolving them after trial. All that is known certainly now is that (a) the company's hope or prediction of declining claims has been dashed by events, (b) there is no evidence that the decline is happening,[3] (c) the worth or cost of new claims is subject to a combination of medical and legal uncertainties, and (d) the upshot is that prudence dictates a need to provide for an indefinite future of liabilities potentially no smaller than those of the last few years. As against the 90,000 total of future claims predicted in November 1988, the company has received 42,000 in just two years, with no sign that the rate will decrease. The figure of 42,000 is also to be compared with the two-year prediction of 34,000. The length of the unknowable future must be imagined in light of epidemiological writings by unquestioned experts projecting a course of potential asbestos disease and resultant claims through half of the next century. Articles in evidence (Exhibits 11, 12 & 13 to D.Ex. B) are helpful in understanding the flood of claims until now, and foretell a continuance of large future numbers. Perhaps the most concrete indicator of what the future holds is the steady annual rate of over 20,000 claims in the year 1987 to date.[4]

evidence that could bear usefully on our inquiry, knowledgeable counsel for asbestos claimants like those appearing on the motion would surely have told us about it. Similar observations apply to plaintiffs' arguments about the lack of expert testimony from investment bankers, economists, or accountants. Again, both in briefs and oral submissions, counsel demonstrated their own ability to deal

The new claims will probably have different components from those of the prior history. So-called "traditional" claims, as Eagle–Picher has labeled them, arise primarily from people whose occupations involved working directly with asbestos or products containing asbestos and those who worked nearby, such as insulation workers, shipyard workers, oil refinery workers and chemical refinery workers. The "non-traditional" claims are generally from people alleging injury from exposure to asbestos already in place, such as construction workers, merchant seamen and sheet metal workers. An even larger group of future "in place" claims will arise from mere occupancy of a structure containing asbestos, as illustrated by a recently filed class action on behalf of a million or so children who have been exposed to asbestos in New York City public schools. There are superficial reasons for supposing that these newer claims will be less costly, and that many will not be meritorious. But the evidence makes it perilous to rely on such suppositions. For example, Eagle–Picher's 1988 forecast contained the premise that one group of 1,800 claims was comprised of totally "worthless cases." It now appears that the cases are "worth" some still undetermined but substantial amount of money. We may also note the elementary knowledge that cases potentially winnable after trial are liable to be costly either for effecting settlements or for achieving the ultimate "success."

(2) Settlements have proved more expensive and less readily available

Settlement predictions were overly optimistic both in terms of the settlement cost per claim and the volume of settlements. The 1988 Plan assumed a per claim indemnity of $4,527 for current claims and $2,750 for future claims. In fact, the average claim indemnity has been approximately

$5,990. (P.Ex. 17.) For the first six months of 1990 approximately 7,800 claims were disposed of compared with 7,100 and 3,400 in the first half of 1988 and 1989, respectively, at an average cost, excluding legal and administrative expense, of $5,900, $5,600 and $7,100, respectively. (P.Ex. 5.)

The higher per claim indemnity is exacerbated by the fact that Eagle–Picher settled 4,000 fewer claims in 1989 than had been projected. Eagle–Picher informs us that the failure to meet its settlement goal is in part attributable to an inability to reach agreement with plaintiffs' attorneys in "high-value" claims in Philadelphia and New York. (D.Ex. C, p. 8.) The effect is that the projected aggregate liability for 1990 is underestimated by the settlement value of the 4,000 claims which were not disposed of as anticipated. Even at the unrealistically low figure of $5,000 per case, this comes to $20 million.

The decline in settlement rates is particularly costly with respect to "bulk" or group settlements; such wholesale dispositions constitute the most economical way to dispose of claims. Docket settlements (settlements of cases listed for trial) are more expensive both in terms of payments to the plaintiffs and in terms of defense costs. Cases taken to verdict carry the additional risk of higher than anticipated jury verdicts (including possible punitive damages) and higher defense costs. Claims that Eagle–Picher planned to settle, but are now likely to become more expensive docket cases, will use more cash. The result is a vicious circle—less settlements mean more expenses, more expenses mean less money available to settle.

(3) Legal expenses exceed predictions

Prior to 1989 the company documented per claim legal expenses. Beginning in fiscal year 1989, legal expenses were aggregated. The 1988 Plan projected aggregate legal expenses at a cost of ap-

---

expertly and instructively with both the available statistics and the imponderables. It would require us to ignore the records of economic forecasters or the evident competence of the witnesses and counsel in this proceeding to imagine that any vital wisdom was lost because there was no expert testimony.

For what it is worth, finally, it may be noted that the engagement partner for defendant's auditing firm confirmed what all of us could have known—that the pervasive uncertainties of the asbestos problem are beyond resolution by accountants and have required for years a qualified opinion on the audit.

proximately $973 per claim for then current and future claims. The per claim legal expense since the beginning of fiscal year 1989 may be as high as $2,668.[5] The aggregate figures for 1989 are similarly impressive. The estimate for aggregate legal expenses in 1989 was $26.2 million. Actual legal expenses were $35 million. (D.Ex. C, Ex. 6.)

(4) Cash flow was over-estimated

The proceeds from the divestiture of three businesses anticipated by the 1988 Plan fell short of expectations by $12.3 million. In addition, the company generated $27 million less from operations in 1989 than was projected by the 1988 Plan. The result is that defendant finds itself compelled to sell more noncore businesses to cover the immediate shortfall. While it may be hoped that the sale of these assets will cover current needs, this stopgap measure reduces Eagle–Picher's sources of operating income from which to make future payments.

The 1988 Plan also assumed collection of insurance proceeds. In addition to $85.3 million received in December 1988 by converting an Aetna Policy to cash, the plan projected collection of insurance totalling $47 million, of which $27 million would be collected in 1991. (P.Ex. 3, p. 33.) According to the Report of Special Master Bertram Harnett, dated September 6, 1990, Eagle–Picher collected $22 million in insurance proceeds on August 1, 1990. The only remaining insurance is approximately $8 million to be collected in fiscal 1990 or 1991.[6] The result is that insurance proceeds were overestimated by approximately $17 million.

The foregoing discrepancies between forecasts and already realized or more probable actualities—relating to claims, costs and cash sources—are by no means complete and cannot in the nature of things be made complete. Among the uncertainties, there remain questions as to how Eagle–Picher's business will fare, the kind and number of claims that will actually be filed and the amounts claimants will ultimately recover, whether by settlement or after trial. But the existence of such uncertainties is by no means a barrier to estimating the "risk" or the "likelihood" that is the subject of our inquiry. The evidence is ample, and the certainties are sufficient, to know that payment of asbestos claims is in jeopardy, that there is a risk that later claimants will not be paid (or, at best, not be paid in full) and that defendant faces likely insolvency in the not too distant future if the current course of events continues unchanged.

Without eliminating the inescapable uncertainties, the company has made monthly projections to measure its most significant liability—the asbestos claims that concern us here—against the sources of cash that it anticipates or hopes or expects to have available to meet those liabilities. The projection dated July 30, 1990, shows profits (by division and aggregated), noncash charges, gains on the sale of operations, asbestos payments, working capital changes, taxes and miscellaneous charges and the resulting cash changes. The projection includes $30 million for expected insurance proceeds, which will leave defendant with no further insurance coverage. The forecast shows a $9.1 million shortfall by fiscal year end 1992. (See D.Ex. C, Ex. 2.) While that figure, with the analysis it reflects, would go far in itself to warrant the findings proposed by the movant, the fact is that the prospects are considerably bleaker.

---

5. This figure, taken from D.Ex. B, Ex. 8, is derived by dividing the legal expenses, $35,020,297, by the number of cases settled, 13,122. This calculation is inexact. The company's aggregate figures include legal costs for pending as well as closed cases. The discrepancy is inconsequential for our purposes in light of the spread between predicted and actual aggregate expenses.

6. Eagle–Picher's insurers have paid over the years just under $246 million for asbestos claims. After the expected $8 million still available, that well will have run dry. As noted, the undisputed insurance picture is recounted and analyzed in useful detail by the Honorable Bertram Harnett, serving as Special Master for this purpose.

The available evidence shows that asbestos liability costs, if the existing course of litigation continues, will probably be substantially higher than those forecasted in July 1990, with a corresponding increase in the cash shortfall. The central factor explaining this negative conclusion is the probable failure of a so-called "50% Plan" for settlements that defendant built into its estimates of July 30, 1990, for the years 1991 and 1992. The 50% Plan was a program under which an Eagle–Picher senior vice president, John E. Powers, hoped to sell to large numbers of plaintiffs' counsel the idea that their clients would be well served by early settlements of their cases for 50% of "established" figures. He hoped that by reducing expenses he could hold the asbestos liability costs for 1990, 1991 and 1992 to the amounts of liability projected by the 1988 plan. The settlement figures are averages, by disease type, of settlements that have been effected over the years. (See P.Ex. 10.) Persuaded that the plan was fair and sensible, Mr. Powers proceeded on a round of visits with counsel. Early responses from a number of attorneys were favorable but contingent on broad acceptance and cash to pay the settlements. The idea was met, however, with a critical mass of rejections; that response, along with uncertainty as to the availability of the necessary cash, appears now to have doomed the plan.

Thus, while we can accept the estimate of $110 million as the asbestos liability figure for 1990,[7] the projections of $85 million for 1991 and $50 million for 1992 are seen to be unduly optimistic, without questioning the good faith on which they were based at the time of their formulation in this incessantly evolving situation. Given the now likely demise of the 50% Plan, the volume of claims outstanding, the expectable new claims and the costs of dispositions, prudence compels upward revision of these figures. How much to raise them is a question admitting of no precise answer. Several interrelated factors will affect the ultimate costs, but are far from closely predictable. The failure of the 50% Plan will mean, probably, fewer settlements. It is likely to lead to higher per claim costs, caused in part by a larger proportion of tried cases. As the per claim costs increase and the volume fails to decline as predicted, the aggregate liability facing the company increases.

From the information now available, the liability projections for 1991 and 1992 would seem to be too low by proportions ranging from 25 to 50%. Translated into cash shortfall at the end of 1992, and without striving for a pretended exactitude, this could mean an increased cash deficiency of as much as $42 million to $75 million rather than the $9.1 million in the July 30, 1990 forecast.[8] There is, in a word, a clear danger of disaster for Eagle–Picher within the next two years.

---

In light of the essentially undisputed developments since the 1988 forecast—and having in mind the central concern that the claims of injured asbestos victims and their kin are at stake—it would call for some bravado to doubt that there is both a likelihood of insolvency and a risk of insufficient assets to pay later claimants. By definition, the likelihood and the risk are less than certainties. It is not possible to foretell mathematically if and when the company will be unable to pay claimants or become insolvent. There is clearly a danger, however, that these things will happen unless there is a change in the material circumstances.

As for insolvency, the company's management in January 1990 reported to its shareholders and the S.E.C. the belief that the company was solvent in the sense

7. This figure is comprised of the $88 million shown on P.Ex. 30 as "Cash (Used) by Asbestos" plus $22 million, already paid out during this year in insurance proceeds.

8. The forecast also assumed that an existing loan under a revolving credit line will be extended when the credit agreement establishing the line expires in November 1991. An extension or renewal is now questionable, meaning that Eagle–Picher may be called upon to repay its loan of $19.8 million at that time.

that the fair value of its assets exceeded the value of its liabilities. The report appears to have been made in good faith and to have been accurate. The condition has not materially changed in the intervening eight months and the company is meeting its obligations as they fall due. It is not now insolvent in any relevant case.[9]

There is a clear threat, however, that the company will become insolvent in the next year or two. When its chief financial officer predicted a $9 million cash shortfall in 1992, the prediction was a responsible one. Nevertheless, in light of later developments, it turns out to have been optimistic. There is a strong prospect of insolvency by the end of 1992.

There is likewise a clear risk that Eagle–Picher will not have the wherewithal for paying later claimants entitled to recover for injuries or deaths from asbestos. It is not questioned that the asbestos liability problem has years to run, extending into the next century. If things go on as they are, thousands of present and prospective claimants are in danger of going unpaid in whole or in part.

### Conclusions

Viewing the questions of risk and probabilities in light of the interests at stake, including centrally the interests of asbestos disease victims and their families, and assuming for this purpose a continuation of asbestos claims against defendant Eagle–Picher in courts throughout the Nation, the evidence is clear and convincing that:

1. The defendant's assets, including the remaining insurance available to it and projecting its future earnings from operations, are and will be so limited as to create a substantial risk that payments for present and prospective asbestos-related claims for personal injury and wrongful death will be in jeopardy.

2. There is a substantial probability that the award of damages to earlier liti-

gants will exhaust defendant's available and projected assets, including available insurance proceeds. (As used in this conclusion, the phrase "substantial probability" represents *a fortiori* an affirmative answer to the second issue posed in the Court's order of reference.)

3. Although the defendant is not now insolvent, there is a likelihood that it will become insolvent within the next two or three years, and well before discharging its asbestos-related liabilities, in either or both of two senses—namely, (a) that its current liabilities will exceed its current assets, and (b) that it will find itself incapable of meeting its obligations as they come due.

Respectfully submitted,
Marvin E. Frankel
Special Master
Dated: New York, New York
    September 7, 1990

9. The company is insolvent for the purpose of Generally Accepted Accounting Principles in the sense that its liabilities exceed the *book value* of

its assets. But these are not values marked to market, and therefore are not indicative of actual insolvency.